T.C. Memo. 2017-229

UNITED STATES TAX COURT

FINIS R. WELCH AND LINDA J. WAITE, Petitioners <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 20611-12.                     Filed November 20, 2017.

<u>George W. Connelly, Jr.</u>, and <u>Heather M. Pesikoff</u>, for petitioners.

<u>M. Kathryn Bellis</u>, <u>Courtney M. Hill</u>, and Sharbel Sfeir (student), for

respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

PARIS, <u>Judge</u>:  Respondent determined deficiencies of $869,416,

$1,533,336, and $1,220,441 in Dr. Welch (petitioner) and Dr. Waite's[1] Federal

_____

[1]Both petitioners have earned doctoral degrees, and they will be referred to

(continued...)

[*2] income tax for 2007, 2008, and 2009, respectively, and determined a deficiency of $1,316,520 in petitioner's Federal income tax for 2010. The sole issue for decision is whether petitioner's ranching activity was engaged in for profit under section 183 for the years in issue.[2]

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The first stipulation of facts, the first supplemental stipulation of facts, and facts drawn from the stipulated exhibits are incorporated herein by this reference. Petitioner resided in Texas and Dr. Waite resided in Illinois when they timely filed their petition.

I. Petitioners' Backgrounds

A. Petitioner

Since middle school petitioner has been involved in vocational agriculture activities. He continued those activities through high school. Tragically, petitioner was in a severe automobile accident during his freshman year of college

---

[1](...continued)
as petitioner and Dr. Waite or petitioners.

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) of 1986, as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[*3] and has been in a wheelchair since. After his recovery he continued his education and earned a bachelor of science degree in agricultural economics from the University of Houston in 1961 and earned a Ph.D. in economics from the University of Chicago in 1966.

Petitioner has had a multifaceted career. He was an economics professor for 40 years and taught at the University of Chicago, Southern Methodist University, the City University of New York, University of California at Los Angeles, and Texas A&M University, and he retired from the last in 2003. In the early 1970s he began testifying as an expert witness in civil litigation cases. In 1976 he founded Welch Consulting and, as of the time of trial, was its sole owner, president, and chief executive officer. Welch Consulting is a private consulting firm that provides economic and statistical consulting for lawsuits involving discrimination claims. It has offices in Los Angeles, California, Washington, D.C., and Bryan, Texas.[3]

In 1979 petitioner incorporated Unicon Research Corp. (Unicon). Through Unicon petitioner conducted his major research activities, which were funded by Federal grants and contracts. Because he found the bureaucratic process of

---

[3]Bryan, Texas, is a small town near College Station, Texas, the location of Texas A&M University, and is approximately one hour from petitioner's ranch.

[*4] obtaining Federal funding too cumbersome, he began funding his own research and supporting it with assistance from Unicon and Welch Consulting. As of the time of trial petitioner still performed managerial activities at Unicon.

In 1982 petitioner formed a partnership, Computing Resource Center (CRC), of which he was a 50% partner. CRC eventually became StataCorp LP. StataCorp provides software for the research community. During the years in issue petitioner was no longer involved in StataCorp's day-to-day operations and did not receive a salary from it.

In 2007 petitioner formed PayEval to develop a statistical program that would assist businesses in assessing the equal opportunity outcomes between demographic groups in pay, promotion, and other areas. After two or three years he was unable to sell the program and ceased development. Starting in 2009 petitioner considered PayEval part of Welch Consulting.

Meanwhile, back at the ranch in Texas Fridays and Saturdays were work days, with the ranch being relatively quiet on Sundays. During the years in issue petitioner spent Thursday nights through Sundays at his ranch.

Petitioner has never had a written business plan for any of his business ventures.

**[*5]** B.    <u>Dr. Waite</u>

Dr. Waite holds a master's degree and a doctorate in sociology. She has been a professor at the University of Chicago since 1991. She and petitioner married in 2007 and divorced in 2010. During the years in issue Dr. Waite split her time between Chicago, Illinois, and petitioner's ranch in Texas, spending the weekends at the ranch with petitioner. Although she toured the ranch with petitioner and occasionally listened to his ideas and plans for it, Dr. Waite was not involved in any of the ranch operations.

II.    <u>Center Ranch</u>

A.    <u>Land</u>

In 1987 petitioner purchased the first 130 acres of land that would become Center Ranch.[4] Center Ranch now comprises nearly 8,700 acres on seven tracts of land in Leon County, Texas, near Centerville.[5] Petitioner purchased thousands of those acres during the years in issue. Center Ranch is split into the following divisions:

---

[4]Petitioners offered expert reports for Center Ranch's real estate, its cattle, and its horses. Over respondent's objections, all of those reports were entered into evidence. Respondent offered no expert reports.

[5]Petitioner owns 8,688 acres and leases another 900 acres for various ranch purposes. See <u>infra</u> p. 7.

| [*6] Division | Acreage[1] | Acquisition dates | Purchase price | Appraised value[2] |
|---|---|---|---|---|
| Headquarters | 2,410 | 1987-2010 | $4,493,166 | $14,630,000 |
| Buffalo Creek | 1,274 | 1989-1999 | 861,563 | 2,720,000 |
| Stanmire/River-bottom | 1,172 | 1990-2008 | 906,687 | 2,900,000 |
| Coker Place | 320 | 2006 | 639,000 | 1,032,000 |
| Trinity River | 2,703 | 2007, 2010 | 3,950,535 | 5,510,000 |
| Keechi Creek | 761 | 1998 | 477,300 | 2,970,000 |
| Bull pens/ receiving pens | 48 | 1989 | 43,500 | 470,000 |
| Total | 8,688 | n/a | 11,371,751 | [3]30,232,000 |

[1]All acreage amounts are rounded to the nearest whole number.

[2]The appraised values are as of Nov. 12, 2013, the inspection date of petitioner's expert witness.

[3]The appraised value of each division includes the surface and mineral rights petitioner owned. The Keechi Creek Division had six acres fenced off for an oil pad, for which petitioner received rent. In 2010 petitioner earned over $900,000 of oil and gas royalties that he reported on a Schedule E, Supplemental Income and Loss (From rental real estate, royalties, partnerships, S corporations, estates, trusts, REMICs, etc.), attached to his return.

Headquarters includes the veterinary clinic (vet clinic), the horse center, the horse training facilities, and the Mill Creek Division, which includes more than 45 acres of lakes.[6] The divisions are noncontiguous tracts of land except for Headquarters

[6]As of 2006 petitioner's personal residence was on 20 acres of Headquarters property and was not considered part of Center Ranch.

[*7] and Mill Creek Division. Petitioner purchased Coker Place as an investment property. Coker Place is wooded, and the 320 acres are leased for hunting. During the years in issue petitioner also leased approximately 900 acres known as Sadler Place Division for ranch purposes.

Additionally, petitioner owned two duplexes on approximately 20 acres of land in Centerville. Although they were in town, petitioner considered the duplexes part of Headquarters. They were purchased when Center Ranch needed housing for ranch hands. If the duplexes were not needed to house ranch hands, they were leased month to month.

B.      Ranch Operations

In 1987 petitioner's original intent was to grow hay as a cash crop and to raise some cattle on the first 130 acres he had purchased. Center Ranch is now a multioperational, 8,700-acre ranch with 25 full-time employees who receive annual salaries ranging from $25,000 to $115,000.[7] Petitioner also employs part-time ranch hands as needed. Over the years petitioner has realigned his workforce to reflect current needs, and he has fired employees for nonperformance or

---

[7]The median household income for Leon County was $40,355 in 2010. U.S. Census Bureau, American FactFinder, https://factfinder.census.gov/bkmk/table/1.0/en/ACS/10_5YR/B19013/0500000US48289 (last visited August 8, 2017). During the years in issue at least four Center Ranch employees' annual salaries were more than that.

[*8] inappropriate behavior. The three main Center Ranch operations are cattle, hay, and horses, each of which will be discussed in more detail infra.

Center Ranch also had a vet clinic that provided services for large and small animals.[8] Construction on the vet clinic began in 2003; it was originally built to support Center Ranch's horse operation. All of the vet clinic's employees--except the veterinarians--were Center Ranch employees. There was a licensed veterinarian on site during each of the years in issue. Petitioner rented the vet clinic facilities to the veterinarians and had management services agreements and licensing agreements with them. The vet clinic provided services for Center Ranch animals under the management services agreements. It provided services for animals owned by the public for a fee. The vet clinic was a separate entity and filed its own tax returns for the years in issue.

Center Ranch had a trucking operation and owned multiple 18-wheeler trucks that it used to move cattle and hay around the ranch and to transport cattle when they were purchased or sold. It also leased the trucks to move the cattle and the hay of others, and it charged the third parties per load hauled. Center Ranch

---

[8]The vet clinic did not start providing services for small animals until 2011, one year after the years in issue.

**[*9]** also performed backhauls--picking up a load on a return trip--to maximize its trucks' use.

Additionally, there was a timber operation--including a timber manager-- and there were several hundred acres leased for hunting on Center Ranch.  In the late 1980s petitioner did only "a little bit" of hunting on ranch property and has done none since then.  During the years in issue Center Ranch had a website and a Facebook page, advertised in the Quarter Horse Directory online, and had videos of its operations and of its horses performing in various competitions posted to YouTube.  As with his other business ventures, petitioner did not have a written business plan for Center Ranch.

During the years in issue petitioner subscribed to the following professional publications:  Brangus Journal, Angus Journal, Showbox (Texas Junior Livestock Association publication), American Red Angus Magazine, Gulf Coast Cattleman, the Cattleman Magazine, the Maine Anjou Voice, Livestock Reporter, Brahman Journal, Working Ranch Magazine, the Ear (a genetics marketing magazine), the Progressive Farmer, Rancher's Exchange, Western Horseman, Quarter Horse News, Quarter Horse Journal, Cutting Horse Chatter, Reined Cow Horse News, Pacific Coast Journal, America's Horse, and Billings' Livestock Commission Horse Sale Update.

**[*10]**        1.      Cattle Operation[9]

Soon after purchasing the initial 130 acres of land, and upon the advice of his high school vocational agriculture teacher, petitioner purchased 34 bred heifers at auction with the intent of using their calves to start a club calf operation.[10] Initially, petitioner's former teacher was going to manage the club calf operation for him.  Unfortunately, he passed away shortly before petitioner purchased the cattle.  After a short period of managing the club calf operation, petitioner decided that it would not be profitable because the prices were low, the bred heifers he purchased were not the preferred club calf breed and did not sell well, and marketing the operation was too time consuming.  In total the club calf operation did not last more than five years.

For business reasons petitioner decided to move to a beef cattle operation and began breeding purebred Maine Anjou cattle.  Unfortunately, because that breed of cattle proved not well suited for the hot and humid climate of Leon County and did not do well, he again modified the operation.  In 1996, after

[9]Some common terms in the cattle industry include:  (1) "calves", which are young cattle, (2) "heifers", which are young females that have not given birth to a calf, (3) "bred heifers", which are pregnant heifers, (4) "cows", which are mature females, and (5) "bulls", which are mature males.

[10]Club calves are produced to be sold to participants in Future Farmers of America and 4-H who will raise and show them for educational purposes.

[*11] conferring with his ranch manager, petitioner sold his Maine Anjou herd and purchased Brangus cattle, which had been developed by crossing Brahmas and Angus cattle. They were known to thrive in heat and humidity. He added purebred Angus cattle to the operation and hired a purebred cattle manager. All of petitioner's Brangus and Angus cattle were registered--the Brangus with the International Brangus Breeders Association and the Angus with the American Angus Association. Center Ranch's purebred herd operation used artificial insemination for breeding purposes, which required constant care and supervision of the purebred heifers in the herd. This proved to be too time intensive for petitioner's ranch hands and was not successful; therefore, he sold his entire purebred herd and fired the purebred cattle manager in 2006.

Later that year petitioner, for business reasons, decided to hire a new cattle manager and began raising a commercial cattle herd to operate a cow-calf operation, in which the product was the calf.[11] Petitioner's ranch employees had previously worked his cattle operation on horseback and continued the tradition with the commercial cattle herd. Because Center Ranch wanted to build the size

---

[11]Commercial cattle are various breeds of cattle that are used to produce calves that are then sold when weaned for a price per pound. In contrast, feeder calves are weaned calves put on grain to gain weight, typically in a feed lot. Center Ranch planned to sell its calves when weaned and did not have a feeder calf operation.

**[*12]** of its herd, it did not sell any of its calves during the years in issue. In addition a small herd of Longhorn cattle was also part of the cattle operation. The Longhorn calves and the commercial calves were used in Center Ranch's horse operation. Center Ranch's ranch manager estimated that it could carry a maximum of 2,000 head of mature cattle.[12] During the years in issue portions of Headquarters and the Buffalo Creek, Trinity River, Stanmire/Riverbottom, and Keechi Creek Divisions were used for the cattle operation.

2.     Hay Operation

In 1988 petitioner began planting hay crop grasses and now grows Coastal Bermuda grass and Tifton 85 Bermuda grass for hay crops in various pastures across Center Ranch. The weather conditions and cattle population would dictate which pastures were used, and if there was enough rainfall, the hayfields could be harvested four to five times a year. Because there were abnormally high to exceptionally high drought conditions in Leon County, Texas, during the years in issue, in an effort to reduce costs petitioner purchased specialized equipment that could spray herbicides at the same time the hay was fertilized. Additionally, Center Ranch cut its fertilizer costs by 10%-12% by spreading its own fertilizer.

---

[12]This number does not include bulls and calves.

[*13] The ranch hands who worked in the hay operation also worked in the cattle operation.

Center Ranch had also built its own feed mill that was used for the chopping and dry storage of the hay. The hay grown on Center Ranch was used to feed its livestock and also to sell to third parties. Hay baled in round bales was to be fed to cattle in the pastures, and hay baled in square bales was to be fed to horses in stalls. Special baling equipment was purchased so that both large, one-ton-plus round bales and 40- to 70-pound square bales could be produced on Center Ranch's hayfields. Approximately two-thirds of the square hay bales were sold to third parties as a cash crop. In the winter months when no hay was grown, Center Ranch incurred feed costs for its animals. In addition to hay the horses were fed pellets and alfalfa cubes that were purchased in bulk.

**[*14]** 3. Horse Operation[13]

In 1999 petitioner attended his first cutting horse show and purchased his first cutting horses--a yearling colt and a yearling filly.[14] Neither of those horses was trained for competition. They were purchased for the ranch's working horse herd to more efficiently work its cattle herd. In 2001 petitioner purchased his first cutting horse with the intent of showing it--a yearling mare, CR Cats Meow. She was not trained at Center Ranch but was sent to a professional trainer. CR Cats Meow never won a major competition and was eventually used solely in the breeding program as a broodmare. In 2003 petitioner purchased a yearling colt, Smart Royal Rey, to be shown. Although Smart Royal Rey did not win a major competition, in 2006 he did tie for seventh place in the National Cutting Horse

---

[13]Some common terms in the horse industry include: (1) "foals", which are young horses, (2) "yearlings", which are horses between one and two years old, (3) "fillies", which are young females before they have foals, (4) "mares", which are female horses, (5) "broodmares", which are mature females expecting or nursing a foal, (6) "recipient mares", which are mares ready to be bred, typically through embryo transplant, (7) "colts", which are young male horses, (8) "stallions", which are male horses and when used for breeding are referred to as "studs", and (9) "sires", which is a term for the male parent of a horse.

[14]A "cutting horse", although not breed specific, is typically an American quarter horse with natural instincts to isolate and remove single animals from a herd. The horses are trained to cut cattle from a herd and contain and deliver them to a certain location. A cutting horse's skills are showcased by competition in timed events.

**[*15]** Association (NCHA) Futurity, the major cutting horse event.[15]  After Smart Royal Rey's NCHA Futurity success, petitioner decided to train his horses at Center Ranch in pursuit of future Futurity winners.

In 2003 petitioner began construction of the horse center, which was completed in 2005.  The horse center is a part of Headquarters; comprises seven buildings, which includes a residence for a horse trainer; and has special barns for stallions, 55 stalls, an arena for training the cutting horses, exercise lots, a walker, an exercise machine, fenced paddocks, a 200-acre pasture for recipient mares, a 35-acre pasture for other mares, and a breeding facility, which operates in tandem with the vet clinic at Center Ranch.[16]  See supra p. 8.  All of the horse center structures, excluding the horse trainer's residence, are utilitarian work structures.  Petitioner's expert witness valued the horse center at approximately $1,148,118.  In 2004 petitioner purchased his first broodmares for a cutting horse breeding program, purchased his last horses used for working horses on Center Ranch, and began focusing Center Ranch's horse operation on cutting horses.

---

[15]The Futurity is for cutting horses what the Kentucky Derby is for thoroughbreds.  Rounding out the cutting horse "triple crown" are the Super Stakes and the Summer Spectacular.  Center Ranch entered horses in all three competitions.

[16]The vet clinic also has a aquatread that is used to condition horses for competition and to rehabilitate injured horses.

[*16] Petitioner then spent two years studying cutting horse genetics and bloodlines in his search for a stallion to build Center Ranch's breeding program. He studied the patterns of cutting horse registrations to learn the bloodlines of the top cutting horses. He was looking for an outcross[17] to breed with the bloodlines of the dominant stallions in the cutting horse industry. Petitioner also consulted cutting horse trainers, who are highly knowledgeable about and influential in the cutting horse industry.

In late 2006 petitioner purchased his first two cutting horse stallions--Peppy Plays for Cash and Little Peppys Ultimo. He used Peppy Plays for Cash primarily for breeding cutting horse mares. Before and during the years in issue petitioner bought and sold almost 100 horses. Some of those horses were foaled at Center Ranch. For business reasons petitioner decided to sell many of those horses at a loss because of their underperformance or unsuitability for next-generation breeding traits.[18] Petitioner also purchased semen and embryos obtained from horses with the right pedigree in an attempt to upgrade the level of cutting horses trained at Center Ranch.

---

[17]An "outcross" is a related bloodline bred with one not closely related.

[18]Although Peppy Plays for Cash is now too old for breeding, petitioner keeps him at Center Ranch and continues to incur costs for his care. Petitioner testified that he did not consider the other options for the horse humane.

[*17] Petitioner decided that for Center Ranch's cutting horse operation to be profitable he needed to breed or purchase a major stallion. To that end he purchased then seven-year-old stallion Woody Be Tuff in early 2008.

Petitioner's intent was for Center Ranch's horse operation to profit from both a breeding program and showing cutting horses. A breeding program generally includes the buying and selling of stallion semen and mare embryos; petitioner bought and sold both. It takes several years to develop a stallion into a stud. The basis of a stallion's value as a stud is his progeny, and a stallion's foals are not typically eligible for competition until four years after breeding.

It will take five to six years before there is credible information about a stallion's breeding capabilities and his ability to pass on vital cutting horse traits to his progeny. A stallion's stud fees will increase over time if his progeny are successful. Although he was a proven stallion bringing in lifetime earnings of over $340,000, during the years in issue Woody Be Tuff was a yet unproven stud for a breeding program--his stud fee was no more than $1,500. But by 2013 his stud fee had increased to $2,000 plus a chute fee,[19] and by 2014 it had increased to $5,000 plus a chute fee. As of the date of trial Woody Be Tuff's progeny had

---

[19]A "chute fee" covers the expenses of collecting a stallion's semen for artificial insemination.

[*18] exhibited his genetic cutting horse traits and had generated prize winnings of over $500,000. Petitioner and Center Ranch can expect to collect semen from Woody Be Tuff until he is in his mid-20s.

Center Ranch has two of the top cutting horse trainers in the nation under employment contract, both of whom have previously been Futurity champion riders. Training a Futurity-level cutting horse takes several years, and the training program required 75 calves every two weeks to train the cutting horses.[20] Center Ranch's cattle operation usually provided the calves for the cutting horse operation. Additionally, Center Ranch consigned calves for the cutting horse training. Although Center Ranch was paid according to the calves' weight gain during their time at Center Ranch, those payments typically would not cover the full cost of consigning the calves for training.

Center Ranch did most of the training, but some of its cutting horses were sent to outside professional trainers. Cutting horse training does not begin until the horse is two years old. The only three-year-old horses remaining in training are those that have outstanding potential. Half of the horses bred cannot cut at competitive levels and become work horses. Additionally, it is not uncommon for

[20]Calves used for the cutting horse training have to be continually changed out because once they become accustomed to being around the horses they will not move.

[*19] horses to be injured during training. An injured or crippled horse's value is substantially reduced and would sell for very little.

Petitioner's horses were entered into the major cutting horse competitions, and he paid thousands of dollars in show fees each year in issue for them to compete, which included entry fees, fees for stalls and shavings, and novice horse fees. There were often multiple Center Ranch horses entered in any one major show. Petitioner's horses were successful, and cutting horse competition winnings increased each year in issue, from $19,231.31 in 2007 to $61,754.55 in 2010.[21] The competition winnings are split between the owner of and the rider of the horse.

Petitioner has invested $9,684,283.52 of his own money as capital for Center Ranch's horse operation.[22] He estimated that approximately two-thirds of his assets and approximately 80% of his annual income are devoted to Center Ranch. During the years in issue petitioner kept books and records for Center Ranch, and Center Ranch had separate bank accounts.

---

[21]Center Ranch's horses had winnings of $150,901.83 in 2011. Additionally, one of Woody Be Tuff's foals from his first foal crop at Center Ranch was a Futurity cochampion in 2012.

[22]This amount includes capital for the vet clinic that overlaps with the horse breeding at Center Ranch. See supra p. 15.

**[*20]** C.     Tax Returns and the Notice of Deficiency

All of the returns for the years in issue were timely filed, and each included a Schedule F, Profit or Loss From Farming. For 2007 petitioners reported gross income of $1,947,824, total expenses of $4,102,617, and a loss of $2,154,793 on the Schedule F attached to their return. The three largest expenses reported were a depreciation and section 179 expense deduction not claimed elsewhere (depreciation) of $860,438, labor hired of $763,339, and feed of $361,093.

For 2008 petitioners reported gross income of $1,740,903, total expenses of $5,763,284, and a loss of $4,022,381 on the Schedule F attached to their return. The three largest expenses reported were depreciation of $1,205,992, labor hired of $849,352, and feed of $601,547.

For 2009 petitioners reported gross income of $1,598,824, total expenses of $4,829,330, and a loss of $3,230,506 on the Schedule F attached to their return. The three largest expenses reported were depreciation of $1,001,300, labor hired of $834,434, and feed of $442,858.

For 2010 petitioner reported gross income of $1,557,821, total expenses of $4,944,260, and a loss of $3,386,439 on the Schedule F attached to his return. The three largest expenses reported were feed of $923,712, depreciation of $921,372, and labor hired of $757,917.

**[*21]** Respondent issued petitioners a notice of deficiency for 2007, 2008, and 2009 determining that the "activity, Schedule F - Livestock" was not engaged in for profit, that the income reported on the Schedules F should have been reported as "Other Income" on the returns, and that petitioners were entitled to a deduction for expenses up to the amount of income that had been reported on the Schedules F on Schedules A, Itemized Deductions.[23]  Respondent issued petitioner a notice of deficiency for 2010 determining that the "activity, Schedule F - Livestock" was not engaged in for profit, that the income reported on the Schedule F should have been reported as "Other Income" on the return, and that petitioner was entitled to a deduction for expenses up to the amount of income that had been reported on Schedule F on Schedule A.

OPINION

I.      Burden of Proof

Generally, the Commissioner's determination of a deficiency is presumed correct, and the taxpayer bears the burden of proving it incorrect.  See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  Moreover, deductions are

---

[23]The Form 886-A, Explanation of Items, attached to the notice of deficiency included a statement that respondent had determined that sec. 6404(g) was applicable for 2007 and that notice was provided to petitioners on August 17, 2011.  The parties did not address this issue.

**[\*22]** a matter of legislative grace, and the taxpayer bears the burden of proving his entitlement to any deductions claimed. INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934).

Under certain circumstances the burden of proof as to factual matters may shift to the Commissioner pursuant to section 7491(a). Petitioners did not argue for a burden shift under section 7491(a), and the record does not establish that the prerequisites for a burden shift have been met; therefore, the burden of proof remains theirs.

II.     Section 183

Generally, the Code allows deductions for ordinary and necessary expenses paid or incurred in conducting a trade or business or for the production of income. Secs. 162(a), 212(1). Under section 183, if an activity is not engaged in for profit, then no deduction attributable to that activity is allowed except as provided for in subsection (b).

To determine whether and to what extent section 183 and the regulations thereunder apply, the activity of the taxpayer must be ascertained. Sec. 1.183-1(d), Income Tax Regs. After all the facts and circumstances are taken into consideration, a taxpayer's multiple activities may be treated as one activity if the activities are sufficiently interconnected. Id. Generally, the Commissioner will

**[*23]** accept the taxpayer's characterization of multiple activities as either a single activity or separate activities. Id. The taxpayer's characterization will not be accepted, however, when it appears that it is artificial and cannot be reasonably supported by the facts and circumstances of the case. Id.

A. Whether Center Ranch's Cattle, Hay, and Horse Operations Were One Activity

Although the parties did not specifically address whether Center Ranch's operations were one activity or separate activities, the Court will analyze the factors from the regulations and caselaw to ascertain how many activities were conducted on Center Ranch. After a review of all of Center Ranch's operations in relation to the factors enumerated in the regulations and caselaw, the Court holds that Center Ranch's operations were one activity.

1. Factors in the Regulations

Under the regulations the most important factors to be considered are: (1) the degree of organizational and economic interrelationship of the undertakings, (2) the business purpose served by carrying on the undertakings separately or together, and (3) the similarity of the undertakings. Id.

All of Center Ranch's operations had a high degree of organizational and economic interrelationship. There was one ranch manager who oversaw all of its

[*24] operations and employees, and he reported directly to petitioner. Many ranch hands worked in more than one of Center Ranch's operations. The staff working out of Headquarters provided support to all of Center Ranch's operations. All of the operations were economically intertwined, with the hay operation providing feed for the cattle and horses and the cattle operation providing calves for training Center Ranch's cutting horses. Petitioner also started supporting operations at Center Ranch--such as the vet clinic and trucking operation--to benefit the inner workings of Center Ranch and to provide for-hire services to others. All of Center Ranch's major operations were similar in that they were common operations to be performed on a working ranch in Texas. While it would be possible to operate a ranch with only one of the three major operations, it would not be uncommon for other ranches to have the same operations as Center Ranch. The operations of Center Ranch meet all of the factors in the regulations to be one activity.

  2. Caselaw Factors

 In addition to the factors in the regulations, the Court considers the following factors: (1) whether the activities are conducted at the same place; (2) whether the activities were part of the taxpayer's efforts to find sources of revenue from his land; (3) whether the activities were formed separately; (4) whether one

[*25] activity benefited from the other; (5) whether the taxpayer used one activity to advertise the other; (6) the degree to which the activities shared management; (7) the degree to which one caretaker oversaw the assets of both activities; (8) whether the taxpayer used the same accountant for the activities; and (9) the degree to which the activities shared books and records. See Topping v. Commissioner, T.C. Memo. 2007-92, slip op. at 15 (citing Mitchell v. Commissioner, T.C. Memo. 2006-145, slip op. at 10-11).

The cattle, hay, and horse operations were all conducted on Center Ranch's 8,700 acres. The cattle and hay operations were spread over seven of the noncontiguous tracts of Center Ranch's land, and the horse operation was on Headquarters acreage. Center Ranch lands were used as a source of revenue. The cattle and horses grazed and were trained on Center Ranch's acreage, and the hay grown as a cash crop was sold to third parties. Although the three major Center Ranch operations did not all begin at the same time, they were each natural outgrowths of the use of Center Ranch lands.

All of Center Ranch's operations were interrelated. The cattle and horse operations both benefited from the hay operation because it provided feed for the animals. The horse operation also benefited from the cattle operation because the cattle operation provided calves for the cutting horse training. The ranch manager

[*26] oversaw all of Center Ranch's operations, with the cattle manager, horse managers, and trainers reporting to him. He also was the caretaker of each operation's assets. Petitioner kept books and records for each operation that were combined as the books and records for Center Ranch.

The Court also notes that for each of the years in issue petitioner attached to his return a single Schedule F reporting Center Ranch's income and expenses, which indicated that he considered Center Ranch's operations one activity. After a review of all of the facts and circumstances and the factors in the regulations and caselaw, the Court finds that Center Ranch's cattle, hay, and horse operations were conducted as a single activity for the years in issue.

B.      Whether the Activity Was Engaged In for Profit

Now that petitioners' activity for the years in issue has been ascertained, see sec. 1.183-1(d), Income Tax Regs., the Court must decide whether the activity was engaged in for profit. To decide whether a taxpayer is carrying on a trade or business so that his expenses are deductible under section 162, the Court examines whether the taxpayer's primary purpose and intention in engaging in the activity is to make a profit. Dreicer v. Commissioner, 78 T.C. 642, 643 (1982), aff'd without published opinion, 702 F.2d 1205 (D.C. Cir. 1983). The taxpayer's expectation of profit need not be a reasonable one, but merely bona fide. Id.; sec. 1.183-2(a),

[*27] Income Tax Regs. Whether a taxpayer expects to realize a profit is a question of fact and is resolved by examining all of the facts and circumstances of the case. Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987); Dreicer v. Commissioner, 78 T.C. at 643-644; sec. 1.183-2(a), Income Tax Regs.

The Court examines the facts and circumstances of the case using the relevant nonexclusive factors in section 1.183-2(b), Income Tax Regs. Dreicer v. Commissioner, 78 T.C. at 644. Those factors include: (1) the manner in which the taxpayer carries on the activity, (2) the expertise of the taxpayer or his advisors, (3) the time and effort expended by the taxpayer in carrying on the activity, (4) the expectation that assets used in the activity may appreciate in value, (5) the success of the taxpayer in carrying on other similar or dissimilar activities, (6) the taxpayer's history of income or losses with respect to the activity, (7) the amount of occasional profits, if any, which are earned, (8) the financial status of the taxpayer, and (9) whether elements of personal pleasure or recreation are involved. Sec. 1.183-2(b), Income Tax Regs. No one factor is determinative. Id. After a thorough review of the facts and circumstances, the Court finds that Center Ranch was a for-profit activity, and the relevant facts and circumstances will be discussed infra.

**[\*28]**        1.        <u>The Manner in Which the Taxpayer Carries On the Activity</u>

Center Ranch's activity was carried on in a businesslike manner.  Petitioner kept books and records for each of Center Ranch's operations to determine their incomes and expenses.  Indeed, petitioner used resources from his other endeavors--namely, Welch Consulting--to keep track of such information.  Respondent tried to make much of the fact that there were mistakes in petitioner's books and records.  The fact that there were some mistakes in the books and records of a multimillion-dollar activity does not negate that the activity was carried on in a businesslike manner.[24]  Center Ranch also had separate bank accounts, which is indicative of an activity being carried on in a businesslike manner.  See <u>Wayts v. Commissioner</u>, T.C. Memo. 1992-82, 63 T.C.M. (CCH) 2032, 2034 (1992) (finding horse racing and breeding activity was carried on in a businesslike manner because it had a separate bank account) (citing <u>Pryor v. Commissioner</u>, T.C. Memo. 1991-109); <u>Hopcus v. Commissioner</u>, T.C. Memo. 1988-181, 55 T.C.M. (CCH) 717, 719 (1988) (finding horse breeding and

---

[24]Respondent argued that one such mistake--petitioner's inability to allocate overhead costs of each operation--made clear that Center Ranch was not carried on in a businesslike manner.  Because the Court finds that Center Ranch's operations were one activity, the allocation of overhead costs between operations, e.g., salaries of ranch hands who worked in both the hay and cattle operations, is of little concern.

[*29] boarding activity was carried on in a businesslike manner because it had a separate bank account); cf. Faust v. Commissioner, T.C. Memo. 2011-158, 102 T.C.M. (CCH) 16, 17-18 (2011) (finding horse activity was not carried on in a businesslike manner because it did not have a separate bank account).

Respondent also argued that petitioner had no written business plan for Center Ranch. The fact that petitioner had no written business plan does not negate a profit motive. Petitioner's business plan was evidenced by his actions. See Annuzzi v. Commissioner, T.C. Memo. 2014-233, at *16 (stating that written financial plan not required for 32-horse farm where business plan was evidenced by action (citing Phillips v. Commissioner, T.C. Memo. 1997-128, 73 T.C.M. (CCH) 2296, 2300 (1997))). Indeed, petitioner did not have a written business plan for any of his endeavors, many of which have been highly profitable.

Petitioner also made changes in the activity when he realized that certain operations would not be profitable. These changes were business decisions. Petitioner changed Center Ranch's cattle operation three times--from club calves, to purebreeds, to a commercial cattle herd--when he realized that a particular cattle operation would not be profitable.

He also added other operations to Center Ranch when the third-party fees for those operations became too costly. Petitioner built the vet clinic when he

[*30] realized he could contract a full-time veterinarian for less than the fees he was paying to outside veterinarians. He also reduced shipping expenses when he added a trucking operation to Center Ranch to haul his own cattle and hay. Those additional operations required substantial capital investment but also reduced variable costs; both of those operations also brought more income to Center Ranch because their services were offered to third parties for a fee. Center Ranch advertised its operations and services through its website and its Facebook page and in online cutting horse directories.

Additionally, the Court finds that Center Ranch was operated in a businesslike manner because of its size and vertical integration. Center Ranch comprises over 8,700 acres in Leon County, Texas, outside of the town of Centerville. It was a well-known and well-regarded working ranch that employed 25 people full time during the years in issue and hired part-time ranch hands when needed. Center Ranch paid some of its employees wages above the county's median wage in its effort to retain the best ranch manager, cattle and horse managers, horse trainers, and ranch hands in the area.

Center Ranch's operations were vertically integrated. The hay operation provided feed to the cattle and horse operations. The cattle operation provided calves to the cutting horse operation for training. The vet clinic and trucking

[*31] operation provided necessary services to Center Ranch and to outside parties for a fee. The integration of all of Center Ranch's operations came about as petitioner decided how to operate the ranch more efficiently and to bring in additional income. All of these decisions were business decisions and were not merely made on the basis of petitioner's whim or fancy.

This factor favors petitioner's argument that Center Ranch was a for-profit activity for the years in issue.

### 2. Expertise of the Taxpayer or His Advisers

Petitioner has been involved with agriculture since his middle school days and with agricultural economics since college. His time in agricultural pursuits alone would give him the professional expertise necessary to oversee a working ranch. Petitioner also subscribed to 20 professional journals that discussed ranching, cattle, and horses. Petitioner hired professionals to manage Center Ranch and contracted with professionals to train its horses, having as many as five managers and trainers during any of the years in issue. Additionally, petitioner had licensed veterinarians at Center Ranch. A profit motive may be indicated if a taxpayer "employs competent and qualified persons to carry on the activity." Sec. 1.183-2(b)(3), Income Tax Regs.

**[*32]** The ranch manager had been involved with ranching almost his entire professional career, and petitioner contracted with the top two cutting horse trainers in the country to train Center Ranch's cutting horses. When petitioner decided to raise purebred cattle on Center Ranch, he hired a cattle manager who was familiar with purebred stock. When petitioner decided, for business reasons, to change the makeup of his cattle herd, he discharged the purebred cattle manager because his expertise was no longer needed. Petitioner then hired a cattle manager familiar with managing a commercial cattle herd. Petitioner consistently surrounded himself with competent managers, trainers, and ranch hands so that Center Ranch operated in a businesslike manner.

This factor favors petitioner's argument that Center Ranch was a for-profit activity for the years in issue.

> 3. The Taxpayer's Time and Effort Expended in Carrying On the Activity

Respondent argues that petitioner did not spend a significant amount of his time and effort on Center Ranch for it to be a for-profit activity because he was only at the ranch on the weekends. Petitioner's weekends at Center Ranch and daily communications with his ranch managers can be sufficient to demonstrate a profit motive. See Givens v. Commissioner, T.C. Memo. 1989-529, 58 T.C.M.

[*33] (CCH) 255, 259 (1989). Petitioner was at Center Ranch for at least three full days of each week--Friday, Saturday, and Sunday--for the years in issue.[25] For the other four days of the week, petitioner was devoting time to Welch Consulting and his other endeavors. That meant petitioner spent slightly less than half of each week at Center Ranch. While at Center Ranch petitioner met with the ranch manager to discuss and visually inspect Center Ranch's operations. He also spoke with the ranch manager daily and with the cattle and horse managers regularly--all of them full-time ranch employees--when away from Center Ranch.

Additionally, petitioner employed other full-time and part-time employees to help operate Center Ranch. During the years in issue there were 25 full-time employees and several part-time ranch hands employed at Center Ranch. The full-time employees' annual salaries ranged from $25,000 to $115,000. The employment of "competent and qualified persons" to carry on an activity when the taxpayer's time devoted to the activity is limited can indicate a profit motive. Sec. 1.183-2(b)(3), Income Tax Regs.; see Annuzzi v. Commissioner, T.C. Memo. 2014-233; McNaught v. Commissioner, T.C. Memo. 1999-25; Dawson v. Commissioner, T.C. Memo. 1996-417, 72 T.C.M. (CCH) 624 (1996).

---

[25]Sundays were generally quiet at Center Ranch. See supra p. 4.

**[\*34]** Petitioner expended significant time and effort--by himself and through his employees--to make Center Ranch a for-profit activity. This factor favors his argument that Center Ranch was a for-profit activity for the years in issue.

### 4. Expectation That the Activity's Assets May Appreciate

"The term 'profit' encompasses appreciation in the value of assets, such as land, used in the activity." Sec. 1.183-2(b)(4), Income Tax Regs. Petitioner argues that he fully expected Center Ranch's land, cattle, and horses to all appreciate and entered into evidence expert witness reports for each. Respondent's only argument is that the land, cattle, and horses would not appreciate as much as petitioner and his experts argue that they would.

An expert witness' opinion is admissible if it assists the trier of fact to understand the evidence or determine a fact in issue. Fed. R. Evid. 702. The Court evaluates an expert's opinion in light of his qualifications and the evidence in the record. See Parker v. Commissioner, 86 T.C. 547, 561 (1986). The Court may accept an expert's opinion in its entirety or be selective as to the portions it finds reliable. See Helvering v. Nat'l Grocery Co., 304 U.S. 282, 295 (1938); Parker v. Commissioner, 86 T.C. at 561-562; Buffalo Tool & Die Mfg. Co. v. Commissioner, 74 T.C. 441, 452 (1980). The Court finds petitioner's real property expert witness and his report credible.

[*35] Respondent and petitioner agree that Center Ranch land was purchased to be used as working ranch land--not primarily with the intent to profit from its increase in value--making the holding of the land and the farming one activity.[26] See sec. 1.183-1(d), Income Tax Regs. Respondent disputes petitioner's valuation of Center Ranch land but offers no expert witness of his own.

The same is true of petitioner's cattle and horse operations--respondent does not dispute that the operations would appreciate, only that petitioner's valuations are incorrect. While respondent offers no expert witnesses of his own, he is correct in part that petitioner's expert witness reports for Center Ranch's horse and cattle operations were valued incorrectly. Both reports included the values of horse and cattle that were not a part of Center Ranch's herds during the years in issue. The Court will exclude those values. The Court also finds reliable the expert witness reports for Center Ranch's cattle and horse operations.

Respondent argues that petitioner must have a profit motive that expects recoupment of all of Center Ranch's past losses. This expectation is too much.

---

[26]This does not include the 320 acres of Coker Place Division or the 20 acres in Centerville on which the duplexes were located. Petitioner testified that Coker Place was purchased primarily for investment purposes. Although the Court finds credible petitioner's testimony that the duplexes were used to house ranch hands when necessary, they were also available for rent when no ranch hands were staying there. Therefore, the duplexes had an income stream that was reported separate and apart from the Center Ranch activity.

**[*36]** "An overall profit is present if net earnings and appreciation are sufficient to recoup the losses sustained in the 'intervening years' between a given tax year and the time at which future profits were expected." Helmick v. Commissioner, T.C. Memo. 2009-220, 98 T.C.M. (CCH) 269, 275 (2009) (citing Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), aff'd, 379 F.2d 252 (2d Cir. 1967)). Therefore, the question is not whether petitioner would recoup all of Center Ranch's losses but whether he would recoup the losses between the years in issue and the "hoped-for profitable future." See id. The Court finds that petitioner's expectation of an overall profit could be realized with the expectation of the appreciation of Center Ranch assets and the value of capital improvements made on Center Ranch lands.

The Court finds that this factor favors petitioner's argument that Center Ranch was a for-profit activity during the years in issue.

> 5. The Taxpayer's Success in Carrying On Similar or Dissimilar Activities

Petitioner has been successful in other professional areas. He built Welch Consulting into a multimillion-dollar consulting firm and was an economics professor for 40 years, teaching at more than one esteemed university. He also was a partner in a successful software company and incorporated a research

[*37] corporation, of which he is still a manager. In his other professional pursuits, petitioner has also made changes and adaptations when needed for business reasons, even ending one pursuit altogether when it was apparent that it would not be profitable. While petitioner has been successful in other endeavors, there is little interplay between his consulting and software businesses and his ranch activity. See Annuzzi v. Commissioner, T.C. Memo. 2014-233.

Because petitioner's success was in dissimilar activities, the Court finds this factor to be neutral.

6.      The Taxpayer's History of Income and Losses With Respect to the Activity and the Amount of Occasional Profits, If Any, Which Are Earned

The parties agree to, and therefore did not brief, the facts that petitioner derived no occasional profits from Center Ranch and that it had reported losses for every year in issue. Although it was not briefed by the parties, a short discussion of Center Ranch's gross income and losses is pertinent.

Center Ranch generated millions of dollars of gross income for each year in issue. Indeed, Center Ranch's income has increased almost every year of its existence. But the steady increase in expenses and in capital investment accompanying this steady income growth has resulted in yearly losses.

[*38] Nevertheless, the years in issue included the startup phases of both the horse operation and the cattle operation, which is discussed in more detail infra.

The startup phase for a horse-related activity is 5 to 10 years. Engdahl v. Commissioner, 72 T.C. 659, 669 (1979). Additionally, horse breeding and performance are speculative activities, with the opportunity for substantial income at every competition or purchase of the right stallion for breeding. See Chandler v. Commissioner, T.C. Memo. 2010-92, 99 T.C.M. (CCH) 1376, 1379 (2010), aff'd, 481 F. App'x 400 (9th Cir. 2012); see also Dawson v. Commissioner, 72 T.C.M. (CCH) at 627 (finding that a taxpayer's belief that a champion horse could generate substantial profits supported the existence of a profit motive). Although petitioner purchased his first cutting horses in 1999, those horses were not purchased to show or breed. It was not until 2001 that petitioner purchased his first cutting horse to be shown. He began construction of Center Ranch's horse center and vet clinic in 2003. Petitioner testified that he did not shift Center Ranch's focus to cutting horses until 2004, and it was not until 2006 that he purchased his first stallion for breeding. Petitioner did not purchase Woody Be Tuff, a major cutting horse stallion, to breed until 2008, one of the years in issue.

The parties stipulated that it takes five to six years to have credible information about a stallion's breeding capabilities; thus during the years in issue,

[*39] Woody Be Tuff's breeding capabilities were speculative. Indeed, Woody Be Tuff's breeding fees steadily increased after the years in issue. In 2013 his breeding fee was $2,000 plus a chute fee, and in 2014 it had increased to $5,000 plus a chute fee.

Although petitioner testified that he did not focus Center Ranch's horse operation on cutting horses until 2004, the Court finds that petitioner's cutting horse operation began in 2003 with the construction of the horse center and vet clinic. See Roberts v. Commissioner, 820 F.3d 247 (7th Cir. 2016) (finding that taxpayer's for-profit horse activity started with the decision to build a "bigger and better horse training facility"), aff'g in part and rev'g in part T.C. Memo. 2014-74. Additionally, Center Ranch's prize winnings from showing its horses increased from a little more than $19,000 in 2007 to over $61,000 in 2010. All of the years in issue--2007, 2008, 2009, and 2010--fall within the usual startup phase for a horse operation.[27] See Engdahl v. Commissioner, 72 T.C. at 669. In this highly

---

[27]Respondent argues that it is not possible to have a profit motive when generating millions of dollars of losses. Because the Court finds that the horse operation was in its startup phase during the years in issue, it need not address at length respondent's argument. But the Court will note that a taxpayer's suffering years of multimillion-dollar losses beyond an activity's startup phase does not bar a profit motive. See, e.g., Metz v. Commissioner, T.C. Memo. 2015-54.

[*40] speculative activity, petitioner is slowly and steadily working towards a highly profitable cutting horse operation.

The Court finds that petitioner began his commercial cattle operation in 2006. Although Center Ranch had previously operated club calf and purebred cattle operations, both of those operations--most notably the purebred operation-- were more labor and time intensive than petitioner intended. Indeed, petitioner credibly testified that artificially inseminating the purebred heifers required extensive individual time and attention for each of the animals and obligated too much of his ranch hands' time. Center Ranch's wholesale change to a new type of cattle operation restarted the clock for the startup period for that operation. Cf. Mathis v. Commissioner, T.C. Memo. 2013-294 (finding that a change in focus to breeding from training cutting horses did not amount to a new activity). The change to a new type of cattle operation was a business decision that required a new cattle manager and a complete turnover of Center Ranch's cattle herd. Therefore, Center Ranch's commercial cattle operation was also in its startup phase. See Burrus v. Commissioner, T.C. Memo. 2003-285, 86 T.C.M. (CCH) 429, 438 (2003) (finding that losses incurred in the first six years of a cattle activity were during the startup phase of the activity (citing Fields v. Commissioner, T.C. Memo. 1981-550)).

[*41] Although Center Ranch has sustained continued losses and had no occasional profits, the years in issue were during both the cattle and horse operations' startup phases. Therefore, the Court finds that the activity's history of income and losses and the amount of occasional profits, if any, favor respondent, but it will not give these factors as much weight because the cattle and horse operations were in their startup phases during the years in issue.

7. The Taxpayer's Financial Status and Elements of Personal Pleasure and Recreation

Petitioners did have substantial wealth and financial resources not related to Center Ranch. Indeed, petitioner contributed over $9 million of his own money for Center Ranch's capital. But wealth not associated with the activity in issue is not a bar to that activity's being engaged in for profit. See Blackwell v. Commissioner, T.C. Memo. 2011-188, 102 T.C.M. (CCH) 137, 143 (2011). Additionally, the receipt of tax benefits standing alone does not establish the lack of a profit motive. See Engdahl v. Commissioner, 72 T.C. at 670. This, coupled with the fact that the injuries petitioner sustained in an automobile accident when he was in college substantially restricted his ability to derive personal pleasure from Center Ranch's outdoor operations--he performed no manual labor on the ranch, did not ride the ranch's horses, and did only a little hunting in the late

**[\*42]** 1980s--does not impede the Court's finding that Center Ranch was operated for profit.

The Court finds petitioner's financial status and elements of personal pleasure or recreation to be neutral factors.

III.    Conclusion

After a review of all of the facts and circumstances and for the reasons stated above, the Court finds that petitioner was engaged in Center Ranch as a for-profit activity during the years in issue.  In so holding, the Court is not declaring Center Ranch a for-profit activity ad infinitum.  If Center Ranch's future losses cannot be reined in, petitioner may again find his profit motives before this Court.

The Court has considered all of the arguments made by the parties, and to the extent they are not addressed herein, they are considered unnecessary, moot, irrelevant, or without merit.

To reflect the foregoing,

Decision will be entered

for petitioners.