T.C. Memo. 2010-92

UNITED STATES TAX COURT

JO ANNE M. CHANDLER, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 6828-07.                    Filed April 29, 2010.

Richard W. Craigo, for petitioner.

Kaelyn Romey and Melissa Quale, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

KROUPA, Judge:  Respondent determined deficiencies in
petitioner's Federal income taxes of $19,494 for 2002, $17,918
for 2003 and $14,763 for 2004.  Respondent also determined
petitioner was liable for the section 6662(a)[1] accuracy-related

_____

[1]All numerical amounts are rounded to the nearest dollar.
                                          (continued...)

penalty for taxable year 2002.  There are two issues for decision.  The first is whether petitioner conducted her horse breeding, training and racing activities (horse activity) for profit within the meaning of section 183 when she failed to generate a profit for over 20 years, including 2002, 2003 and 2004 (the years at issue).  We hold that she did not conduct her horse activity for profit and is therefore not entitled to deduct losses from the activity on her returns.  The second issue is whether petitioner is liable for the accuracy-related penalty for 2002.  We hold that she is liable for the penalty.

                        FINDINGS OF FACT

     Some of the facts have been stipulated and are so found.
The stipulation of facts and the accompanying exhibits are incorporated by this reference.  Petitioner resided in California at the time she filed the petition.

A.  Petitioner's Background

     Petitioner graduated from Merritt College in Oakland, California, with a degree in accounting.  She held various accounting jobs after college, including a job with the Oakland Municipal Court where she prepared budgets of up to $8 million.

     Petitioner had significant income from sources other than the horse activity totaling $166,861 in 2002, $150,472 in 2003

---

     [1](...continued)
All section references are to the Internal Revenue Code in effect for the years at issue.

and $148,059 in 2004.[2] The retirement income, Social Security income, rental income, gambling income and income from savings petitioner received during the years at issue enabled her to continue her horse activity without generating any profit. She earned additional income from her employment as a pari-mutuel clerk in 2003 and 2004. Petitioner and her husband bet on horses as a form of recreation. Petitioner personally placed bets at the track and on the internet during the years at issue. She reported gambling winnings of $35,000, $18,000, and $10,000 on the returns for 2002, 2003 and 2004, respectively.

B. Petitioner's History With the Horse Activity

Petitioner was engaged in breeding, training and racing thoroughbred horses during the years at issue. She incurred substantial losses in her horse activity for over 20 years before and including the years at issue.

Petitioner first became interested in horses when she was a child. Her father, a construction worker by trade, bred and raced horses in California and he taught petitioner how to care for them. Petitioner was not personally involved with horses for almost 40 years until 1981 when she decided to get involved with horse racing by "claiming" a racehorse.[3] She was 51 years old at

_____

[2]These amounts include gambling income petitioner earned on horse betting separate from her horse activity.

[3]The horses running in a claiming race are being offered for
(continued...)

the time and she held a job in another industry.  Petitioner claimed her first horse, Tardson, in 1982.

Petitioner admitted that horse racing is highly speculative. She did not provide any specific details about her purse winnings during any of the years at issue.  In fact, the record reflects that petitioner raced the same unsuccessful horses year after year, even though they failed to generate enough money to exceed the expenses for any year.  Additionally, several of petitioner's racehorses died or suffered serious injuries during the years at issue.

Petitioner expanded her horse activity to include horse breeding in 1983 when she purchased a breeding mare with foal. Her primary goal for the breeding program was to obtain an "outstanding horse" for racing because she could not afford to buy one.  She admitted that breeding an outstanding horse is highly speculative and that the costs of operating a breeding program greatly exceed the costs associated with buying a racehorse.  Petitioner stopped breeding her mares after 2002.  At the time of trial petitioner had not developed an outstanding horse that could win and be sold for a large sum.  The most she received for selling any horse through 2004 was $750.

---

[3](...continued)
sale.  Someone who "claims" a particular horse owns that horse as soon as it leaves the starting gate.

Petitioner began using two of her stallions for stud service in 1996. The only income petitioner earned from stud fees during the years at issue was $555, however, and that was only in 2003.

Petitioner obtained a trainer's license from the California Horse Racing Board in 1988 after completing a licensing exam. She asserts she obtained the training license to save money on training fees for her racing program. Petitioner failed to provide documentation, however, to establish that her decision to train her own horses was an economic decision and there was no cost-benefit analysis to quantify the benefit to her horse activity. She also asserts she trained horses for other owners. Petitioner failed to provide any training contracts, however, and she failed to show any income from training horses for others.

Petitioner consulted with William Anton (Mr. Anton) and Terry Johnson (Mr. Johnson), both horse trainers and owners, over the course of her horse activity. Neither Mr. Anton nor Mr. Johnson knew whether petitioner's horse activity was profitable. There is also no evidence on how, if at all, consulting with these two trainers and owners caused petitioner to improve her losing operation. Nothing establishes that either Mr. Anton or Mr. Johnson provided petitioner with economic or business advice, and that she followed their advice.

Petitioner did not make any meaningful changes to improve the profitability of her horse activity, despite her over 20-year

history of losses. She also has not set any limit on the amount she is willing to lose. The expenses of petitioner's horse activity have increased each year. She asserts that she implemented some cost-saving measures to decrease the spiral of losses. These measures include transporting her horses with her own truck and trailer to avoid the expense of commercial horse vans. Petitioner failed to establish, however, whether her cost-saving measures were based on any economic analysis of her business. She has retained, and continues to incur expenses for, several horses that are useless to her horse activity. Petitioner also admitted that she incurs substantial costs by providing feed for other horses without seeking reimbursement from their owners. She stoically says she will continue this practice regardless of the great expense.

C. Petitioner's Time and Effort With the Horse Activity

Petitioner scaled back her horse activity in 2002 when health problems plagued her and her husband. She was diagnosed with breast cancer in 2002 when she was 72 years old and subsequently underwent two operations and 37 radiation treatments. Petitioner's husband suffered from Parkinson's disease and his condition significantly deteriorated during the years at issue. He passed away in 2005, after the years at issue.

Petitioner did not provide specific details of the time she devoted to her horse activity during the years at issue. She relied on friends or hired people to assist her with cleaning stalls and caring for her horses. Petitioner spent time at the racetrack monitoring her horses and watching them "at the rail" when they exercised. She socialized with other trainers and owners who were at the rail watching their horses. Petitioner also placed bets on horse races while overseeing her horse activity at the track.

D. <u>Petitioner's Books and Records for the Horse Activity</u>

Petitioner at some point kept her horse records on a computer but switched to keeping them by hand during the years at issue because it was easier for her. She scribbled down expense records but failed to organize them into any useable form, and her expense records for the years at issue were incomplete and indecipherable. Petitioner failed to keep a separate record of each horse's income and expenses. She produced manila files for each horse she bred, trained or raced, but the files did not contain information necessary to evaluate the horse's economic performance. The files contained sentimental documents, such as race clippings, photos, and letters written by petitioner to the horse. Petitioner did not maintain any record of what she paid to claim each horse and how much that horse had won.

Petitioner did not produce any background financial records to substantiate the income and expenses claimed on the returns for 2002 and 2004, and she produced only three receipts for 2003. She never prepared written business plans, budgets, financial projections, or financial statements, nor did she employ any cost accounting methods to evaluate the profitability of her horse activity. Petitioner maintained four bank accounts during the years at issue but commingled the funds from her horse activity with her personal funds.

Petitioner did not review any documents at year's end to make changes to the horse activity to improve profitability. The only document she prepared at year's end was a tax organizer for her return preparer, Robert D'Amours (Mr. D'Amours). Petitioner did not provide him with any books or records beyond the tax organizer. Mr. D'Amours prepared petitioner's returns for the years at issue by simply inputting the numbers she had supplied in the tax organizer. Petitioner claimed losses of $74,772 for 2002, $69,782 for 2003 and $58,702 for 2004 on Schedule F, Profit or Loss From Farming.

E. The Deficiency Notice

Respondent issued the deficiency notice to petitioner disallowing the Schedule F losses for the three years at issue, and determining deficiencies for those years. Respondent also

determined that petitioner was liable for the accuracy-related penalty for 2002.  Petitioner timely filed a petition.

OPINION

We are asked to decide whether a horse owner and operator engaged in training, racing and breeding horses for profit within the meaning of section 183 when she failed to generate a profit from those activities during any of the years at issue or for any of the preceding 17 years.  We are also asked to decide whether petitioner is liable for the accuracy-related penalty for 2002. We address each of these issues in turn.

I.  Section 183 Analysis

A.  In General

Taxpayers are precluded from claiming deductions stemming from an activity that is not carried on for profit except to the extent allowed by section 183(b).[4]  See sec. 183(a).[5]  We

----

[4]Deductions that would be allowable without regard to whether the activity is engaged in for profit are allowed under sec. 183(b)(1).  Deductions that would be allowable only if the activity is engaged in for profit are allowed under sec. 183(b)(2), but only to the extent that the gross income from the activity exceeds the deductions otherwise allowable under sec. 183(b)(1).

[5]We follow the Court of Appeals opinion squarely on point when appeal from our decision would lie to that court absent stipulation by the parties to the contrary.  Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971).  Taxpayers residing in the Ninth Circuit, such as petitioner, must prove they conducted their activities with the primary, predominant or principal purpose of realizing an economic profit independent of tax savings.  See Wolf v.

(continued...)

structure our analysis of whether an activity is engaged in for profit around nine nonexclusive factors. Sec. 1.183-2(b), Income Tax Regs. The nine factors are: (1) the manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his or her advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. Id.

No factor or set of factors is controlling, nor is the existence of a majority of factors favoring or disfavoring a profit objective necessarily controlling. Hendricks v. Commissioner, 32 F.3d 94, 98 (4th Cir. 1994), affg. T.C. Memo. 1993-396; Brannen v. Commissioner, 722 F.2d 695, 704 (11th Cir. 1984), affg. 78 T.C. 471 (1982); sec. 1.183-2(b), Income Tax Regs. The individual facts and circumstances of each case are

---

5(...continued)
Commissioner, 4 F.3d 709, 713 (9th Cir. 1993), affg. T.C. Memo. 1991-212; Polakof v. Commissioner, 820 F.2d 321, 323 (9th Cir. 1987), affg. T.C. Memo. 1985-197; Indep. Elec. Supply, Inc. v. Commissioner, 781 F.2d 724, 726 (9th Cir. 1986), affg. Lahr v. Commissioner, T.C. Memo. 1984-472.

the primary test. <u>Abramson v. Commissioner</u>, 86 T.C. 360, 371 (1986).

 B. <u>Analysis</u>

 We now apply the factors to the facts of this case. Nearly all the facts in this case indicate that petitioner did not engage in her horse activity for profit.

 First, petitioner did not conduct her horse activity in a businesslike manner. See <u>Engdahl v. Commissioner</u>, 72 T.C. 659, 666-667 (1979); sec. 1.183-2(b)(1), Income Tax Regs. She had four checking accounts during the years at issue but not one was devoted exclusively to the horse activity. See <u>Keating v. Commissioner</u>, T.C. Memo. 2007-309, affd. 544 F.3d 900 (8th Cir. 2008). Petitioner also did not maintain adequate business records for her horse activity. She did not use any cost accounting methods to determine the overall profitability of the horse activity despite her accounting background. See <u>Burger v. Commissioner</u>, T.C. Memo. 1985-523, affd. 809 F.2d 355 (7th Cir. 1987). Petitioner also did not keep a separate record of each horse's income and expenses to evaluate its economic performance. See <u>McKeever v. Commissioner</u>, T.C. Memo. 2000-288. The manila files she maintained for each of her horses contained sentimental documents with limited health and training records. Maintaining these types of records, however, is as consistent with a hobby as with a business. See <u>Golanty v. Commissioner</u>, 72 T.C. 411, 430

(1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); Giles v. Commissioner, T.C. Memo. 2006-15.

Petitioner had no oral or written business plan. She simply wanted to "claim a racehorse" when she began her horse activity in 1982. Petitioner also did not make any meaningful changes in her method of operation to improve profitability. See sec. 1.183-2(b)(1), Income Tax Regs. She argues that she implemented some cost saving measures, such as training and transporting her own racehorses, to show that she sought to make a profit. Petitioner failed to establish, however, that she implemented the measures for economic reasons and she prepared no projections to show when any of these measures would cause the activity to generate a profit. Moreover, none of these measures caused petitioner to earn a profit. We find that petitioner's failure to maintain adequate records and to make significant changes in light of her over-20-year history of substantial losses shows that she did not conduct her horse activities in a businesslike manner. This factor weighs in favor of respondent.

Petitioner also has not shown that she studied accepted business, economic, and scientific practices related to her horse activities and acted in accordance with those practices. See sec. 1.183-2(b)(2), Income Tax Regs. Petitioner consulted with Mr. Anton and Mr. Johnson, both horse owners and trainers, but neither Mr. Anton nor Mr. Johnson provided her with business

advice.  In fact, neither Mr. Anton nor Mr. Johnson knew whether petitioner's horse activity was profitable.  Furthermore, petitioner provided nothing to demonstrate how consulting with Mr. Anton or Mr. Johnson helped her prevent her losses from increasing.  We find petitioner's failure to seek out and follow business, economic or scientific advice indicates that she did not have a profit motive.  This factor weighs in favor of respondent.

We also question petitioner's testimony regarding the time and effort she spent on the horse activity.  See sec. 1.183-2(b)(3), Income Tax Regs.  Petitioner claims that during the years at issue she spent an average of eight hours a day, seven days a week, 30 days a month, carrying out such tasks as feeding and grooming her horses and cleaning stalls.  She did not provide any evidence beyond her own self-serving testimony to substantiate this claim.  The record shows that not all the time petitioner devoted to her horses was work related.  The record also reflects that during the years at issue petitioner and her husband had medical problems and that she paid individuals or relied on friends to complete the manual labor.  Accordingly, we find the time and effort expended by or on behalf of petitioner to be a neutral factor.

Petitioner offered nothing to support an expectation that her horses would appreciate in value.  See sec. 1.183-2(b)(4),

Income Tax Regs.  First, petitioner had no way of determining the value of a horse because she did not maintain any record of what she paid to claim each horse and how much that horse had won. Furthermore, petitioner had never sold a horse for over $750, and most of her horses sold for less than $400.  Even if petitioner expected her horses to appreciate in value, any expectation of recouping the hundreds of thousands of dollars in accumulated losses would be unlikely.  Accordingly, this factor weighs in favor of respondent.

Petitioner provided nothing to establish she ever owned or operated a successful business venture.  See sec. 1.183-2(b)(5), Income Tax Regs.  She claimed that she and her husband had a successful venture "flipping" houses but did not produce any evidence to support this assertion nor was a gain reported on the returns for 1996 through 2004.  Accordingly, this factor is neutral.

Petitioner sustained large ever-increasing losses from the horse racing activity for 20 years in succession, from its start in 1982 through the years at issue.  Respondent conservatively estimates that petitioner's losses from 1981 through 2007 exceed $1.5 million.  The losses petitioner incurred during the years at issue were well beyond the accepted five-to-ten-year startup period for horse breeding.  See Engdahl v. Commissioner, supra. Nevertheless, petitioner tried to explain away the losses by

claiming they were due to unforeseen hardships, including death or serious injury to several horses during the years at issue.[6] We recognize that horse breeding and racing are speculative activities where death or injury to horses is a common occurrence. Even petitioner's witness Mr. Anton, a racehorse owner and trainer, testified that the loss of several horses during a given year "can be normal." We do not find that the losses were caused by unforseeable circumstances. Accordingly, we find that petitioner's history of large losses weighs in favor of respondent.

Furthermore, petitioner's horse activity has never made even an occasional profit. See sec. 1.183-2(b)(7), Income Tax Regs. Petitioner claims that she made a profit with her horse "Award Winning" in 2006, which is after the years at issue. Moreover, the return for that year reports a loss. Petitioner further contends that we should disregard her history of losses because she could potentially earn a substantial profit with one outstanding horse. The possibility of a speculative profit is insufficient to outweigh the absence of profits for a period

---

[6]Petitioner also argues that her own illness and her husband's illness were unforeseen hardships that contributed to the losses. This claim directly contradicts petitioner's claim that she continued to devote eight hours a day, seven days a week, to the horse activity despite her and her husband's illnesses. It also overlooks petitioner's long history of losses before the years at issue. We find, therefore, that petitioner's and her husband's illnesses were not unforeseen hardships that contributed to petitioner's losses.

greater than 20 years, however.  <u>McKeever v. Commissioner</u>, T.C. Memo. 2000-288.  Accordingly, petitioner's failure to make even an occasional profit in over 20 years weighs in favor of respondent.

Petitioner had substantial income from other sources[7] and was able to reduce this income by approximately 40 percent by claiming Schedule F losses from the horse activity.  See sec. 1.183-2(b)(8), Income Tax Regs.  This factor favors respondent.

Petitioner derived pleasure and recreation from her horse activity.  See sec. 1.183-2(b)(9), Income Tax Regs.  She combined her racing and training activities with social and recreational activities at the track.  See sec. 1.183-2(c), <u>Example</u> (<u>3</u>), Income Tax Regs.  Petitioner enjoyed spending time "at the rail" with other trainers and owners.  She also placed bets while overseeing her horse racing activity.  This factor favors respondent.

Based on all the facts and circumstances, we find that petitioner has not shown that she engaged in her horse activity for profit.  Accordingly, we sustain respondent's determination in the deficiency notice regarding the losses.

---

[7]She had income totaling $166,861 in 2002, $150,472 in 2003 and $148,059 in 2004.  She claimed net losses from the horse activity of $74,772 in 2002, $69,782 in 2003 and $58,702 in 2004.

## II. Accuracy-Related Penalty for 2002

We now address whether petitioner is liable for the section 6662(a) accuracy-related penalty for 2002, the only year for which respondent determined a penalty. Respondent asserts petitioner is liable for the penalty because she failed to maintain adequate books and records for that year. We agree.

A taxpayer is liable for an accuracy-related penalty for any portion of an underpayment of income tax attributable to negligence or disregard of rules and regulations. Sec. 6662(a) and (b)(1). Negligence is defined as any failure to make a reasonable attempt to comply with the provisions of the Code and includes any failure by the taxpayer to keep adequate books and records or to substantiate items properly. Sec. 6662(c); sec. 1.6662-3(b)(1), Income Tax Regs.

Petitioner failed to keep adequate books and records to substantiate the horse-activity-related losses she claimed for the years at issue, including 2002. Petitioner's explanation that it was easier to keep records in writing than on a computer does not satisfy the accurate books and records requirement. Even her handwritten records were incomplete and indecipherable. Moreover, petitioner failed to present any defense. Accordingly, we sustain respondent's determination of the section 6662 accuracy-related penalty.

We have considered petitioner's other arguments and conclude they are irrelevant, moot, or meritless.

<u>Decision will be entered</u>

<u>for respondent</u>.